IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DANNY WEEKS and | ) | |
| VICKI WEEKS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CASE NO. 1:10-CV-602-WKW |
| v. | ) | [WO] |
| | ) | |
| WYETH, INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This action is one in a long line of lawsuits alleging inadequate and illegal conduct on the part of the various pharmaceutical companies that "innovated, made, promoted, and sold" the prescription drug Reglan® or its generic counterpart, Metoclopramide ("MCP").  (Doc. # 142, at 1.)  Plaintiffs Danny and Vicki Weeks contend that Mr. Weeks ingested MCP in accordance with a prescription from his treating physician and developed a severe and incurable neurological disorder as a result.  The Weeks allege that his diagnosis is the proximate result of Defendants Wyeth, Inc. ("Wyeth"),[1] Pfizer, Inc. ("Pfizer"),

---

[1] As noted in the Weeks's Amended Complaint, Pfizer acquired Wyeth in a cash and stock merger on October 15, 2009.  As a result of the merger, Pfizer acquired all of Wyeth's assets and assumed the full extent of Wyeth's liabilities.  Pfizer is named in the Amended Complaint solely as the successor to Wyeth's liability.

Schwarz Pharma, Inc. ("Schwarz"),[2] Actavis Elizabeth, LLC, ("Actavis"), and Teva Pharmaceuticals USA's ("Teva") dissemination of "inaccurate, misleading, materially incomplete, false and/or otherwise inadequate information" concerning the potential effects of exposure to Reglan/MCP.  (Doc. # 142, at 8.)  They bring the following claims against each Defendant: strict liability (Count I); negligence (Count II); breach of implied warranty (Count III); breach of express warranty (Count IV); fraud by misrepresentation (Count V); fraud by concealment, suppression, or omission of material facts (Count VI); failure to adequately warn (Count VII); and loss of consortium (Count VIII).

Presently before the court is Defendants Teva and Actavis's ("Generic Defendants") Motion for Judgment on the Pleadings, in which they argue that the Weeks's claims against them are preempted by federal law.  (Doc. # 191.)  The motion has been fully briefed.  (Docs. # 191, 194, 197.)  Upon consideration of the parties' arguments, the record, and the relevant case law, the court finds that the Generic Defendants' motion is due to be granted.

## I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1332.  The parties do not contest personal jurisdiction or venue.

---

[2] Schwarz entered an Asset Purchase Agreement with Wyeth on December 27, 2001, whereby Schwarz purchased the rights and liabilities associated with Reglan subject to an indemnification provision.

## II. BACKGROUND

**A.** **Facts**

The FDA approved Reglan® in 1980 as a short-term therapy[3] for adults suffering from gastroesophageal reflux who did not respond to conventional therapy and to relieve the symptoms associated with acute and recurrent diabetic gastric stasis.  Simply put, Reglan® was designed to increase the speed at which food travels through the digestive system.  In 1985, pharmaceutical manufacturers began producing MCP – a generic version of Reglan®.  MCP is equivalent to Reglan® in all therapeutically relevant aspects, including dosage, strength, and active ingredients.

Mr. Weeks's physician prescribed him MCP in 2007, and he took the drug for approximately two years.  In 2009, Mr. Weeks was diagnosed with tardive dyskinesia ("TD").   TD is a neurological disorder that commonly causes "involuntary, repetitive movements of the extremities, or lip smacking, grimacing, tongue protrusion, teeth grinding, rapid eye movements or blinking, puckering and pursing of the lips, and/or impaired and involuntary movement of the fingers." (Doc. # 142, at 12.)  Mr. Weeks suffers from one or more of these symptoms.  At present, there is no known cure for TD, and its effects rarely are reversible.

---

[3] Reglan® was never approved for use longer than twelve weeks.

The Weeks allege that Mr. Weeks's prolonged ingestion of MCP caused him to develop TD.  The active ingredient in MCP works to block the transfer of dopamine within the brain, which in turn causes the brain to produce additional dopamine receptors.  Ultimately, prolonged MCP ingestion may lead the areas within the brain that control movement to become hypersensitive to dopamine, potentially resulting in the development of a neurological movement disorder. "Studies have shown that up to 29% of patients who take [MCP] for several years develop [TD]." *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2572 (2011).

In the Amended Complaint, the Weeks allege that Defendants had actual knowledge that the risk of developing TD or another neurological side effect from long-term use of Reglan® or MCP was "approximately 100 times greater" than the risk that Defendants disclosed to medical professionals.  (Doc. # 142, at 13.)  The Weeks contend that Defendants failed to warn doctors and patients of the risks associated with long-term use and even "encouraged long term use of the drug," concealing the drug's "true risks and the true prevalence of side effects."  (Doc. # 142, at 13.)  The Weeks assert that, had Mr. Weeks's treating physician been warned of the true risks of MCP, he would have adjusted the prescription to avoid the risks associated with long-term use or not prescribed the drug at all.

## B.    Procedural History

This case has a lengthy and complex procedural history.  The Weeks initially brought suit in July 2010.  The Brand-Name Defendants[4] responded with a motion to dismiss.  In the motion, they argued that Mr. Weeks only ingested the generic MCP, and accordingly, the Weeks could not maintain products-liability claims against them as the manufacturers and sellers of Reglan®.  On March 31, 2011, the Brand-Name Defendants' motion to dismiss was granted in part and denied in part. The court held that to the extent the Weeks were seeking "to argue that the Brand-Name Defendants owed Mr. Weeks a duty to disclose information either about Reglan or generic MCP, the Weeks's claims must fail."  (Doc. # 86, at 6.) However, it was determined that the Brand-Name Defendants had not carried their burden of persuading the court that the Brand-Name Defendants did not owe a duty to disclose information about Reglan® to Mr. Weeks's prescribing physician.

Shortly after it was determined that the Weeks's claims would withstand the motion to dismiss, the Brand-Name Defendants moved to stay the action to allow the Eleventh Circuit to issue its opinion in *Simpson v. Wyeth, Inc*., No. 11-11197 (11th Cir.).  The Brand-Name Defendants argued that *Simpson* presented the same issue existing in this case – "namely, whether brand-name drug manufacturers can be held liable for harm caused by a generic product manufactured and distributed

---

[4] The Brand-Name Defendants are Wyeth, Pfizer, and Schwarz.

by an unrelated generic manufacturer. (Doc. # 87, at 1.) The Weeks opposed the stay and moved to amend their complaint. On April 14, 2011, the motion to stay was denied.

In response to the denial, the Brand-Name Defendants moved the court to certify the unresolved question to the Alabama Supreme Court. On August 25, 2011, the court granted the motion and certified the following question to the Supreme Court of Alabama: "Under Alabama law, may a drug company be held liable for fraud or misrepresentation (by misstatement or omission), based on statements it made in connection with the manufacture or distribution of a brand-name drug, by a plaintiff claiming physical injury from a generic drug manufactured and distributed by a different company?" (Doc. # 117.)

Before the Alabama Supreme Court responded to the certification request, the Generic Defendants filed a motion to dismiss and a response in opposition to the Weeks's motion to amend their complaint. They argued that the recent Supreme Court decision in *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011), established that federal law preempted state-tort law claims against generic pharmaceutical manufacturers and that the Weeks's motion to amend was an unsuccessful attempt to plead around the *Mensing* holding. After a period of briefing and the filing of supplemental authority, the Weeks were given leave to amend their complaint and the Generic Defendants filed a motion to dismiss the

newly amended complaint.  On June 6, 2012, however, the court chose to stay the entirety of the action until the Alabama Supreme Court addressed the certified question.  In light of the stay, the court also denied the pending motion to dismiss with leave to refile upon the conclusion of the certification process.

On January 11, 2013, the Alabama Supreme Court issued its opinion on the certified question.  The Alabama Supreme Court determined that liability *could* extend to brand-name manufacturers and developers for fraud or misrepresentations made in connection with the manufacture and sale of a brand-name drug, by a plaintiff who was injured by the generic drug manufactured and distributed by a different company.  The Brand-Name Defendants, however, timely moved for a rehearing, which the Alabama Supreme Court granted.

On August 15, 2014, the Alabama Supreme Court withdrew its January 11, 2013 opinion and issued a new opinion.  Despite the issuance of a new opinion, the Alabama Supreme Court's legal determination largely was unchanged.  For a second time, it concluded that liability *could* extend to brand-name manufacturers and developers for fraud or misrepresentations made in connection with the manufacture and sale of a brand-name drug, by a plaintiff who was injured by the generic drug manufactured and distributed by a different company.  The Brand-Name Defendants again applied for a rehearing, but the Alabama Supreme Court

denied their application, and on September 3, 2014, a certificate of judgment was issued, making the determination as to the certified question final.

Upon the conclusion of the certification process, the stay was lifted, and a new scheduling order was entered. The Generic Defendants then responded with the now pending motion for judgment on the pleadings.

### III.  STANDARD OF REVIEW

**A.   <u>Generic Defendants' Motion for Judgment on the Pleadings</u>**

The Generic Defendants filed their motion for judgment on the pleadings on December 10, 2014, approximately one week after the order was entered lifting the stay over the action.   The Generic Defendants filed the motion without first answering the Weeks's Amended Complaint.   In fact, to date the Generic Defendants have not answered the Weeks's Amended Complaint.

Because the Generic Defendants have not filed answers, the Weeks argue that the Generic Defendants are precluded from receiving a judgment on the pleadings.   For support, they highlight Rule 12(c) of the Federal Rules of Civil Procedure, which provides that, "after the pleadings are closed—but early enough not to delay trial—a party may more for judgment on the pleadings."   Fed. R. Civ. P. 12(c).   The Weeks also highlight *Perez v. Wells Fargo N.A.*, in which the Eleventh Circuit explained that, "[w]hen a defendant fails to answer, Rule 12(c)

precludes a judgment on the pleadings because the pleadings have not yet closed, and competing pleadings do not exist."  774 F.3d 1329, 1337 (11th Cir. 2014).

The Weeks are correct that, because the Generic Defendants have yet to file an answer to the Amended Complaint, a motion for judgment on the pleadings is not an appropriate avenue for seeking dismissal of the Weeks's claims.  *Id*. at 1336–37.  A review of case law, however, demonstrates the power of the court to avoid judicial inefficiency by considering the motion for judgment on the pleadings as a timely motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  In *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123 (2d Cir. 2001), the Second Circuit evaluated an analogously situated case.  The *Patel* plaintiff had appealed a district court's grant of a motion to dismiss for failure to state a claim on grounds that the defendant had filed his motion to dismiss after first answering the complaint.  *Id*. at 125.  Accordingly, the plaintiff contended that the district court should not have considered the motion to dismiss because a Rule 12(b)(6) motion is only timely if filed prior to an answer.  *Id*.  The Second Circuit, however, in addition to determining that the defendant had in fact not filed a valid answer, also concluded that, when a Rule 12(b)(6) motion to dismiss is filed after the close of pleadings, the "appropriate response is to treat such an untimely motion to dismiss as a motion for judgment on the pleadings under Rule 12(c)."  *Id*. at 126.

The Second Circuit ultimately provided two persuasive reasons for construing the motion as a motion for judgment on the pleadings. *Id.* First, it explained that each of the sister circuits that had recently addressed the question had arrived at the same answer. *Id.* (listing decisions from the Third, Fourth, Fifth, Seventh, Eighth, and Ninth Circuits). Second, it noted that construing the motion under the 12(c) standard made "eminently good sense" because

> [t]he standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim. In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. The court will not dismiss the case unless it is satisfied that the complaint cannot state any set of facts that would entitle him to relief.

*Id.* (omitting internal citations and quotation marks).

More recently, the district court for the District of Columbia directly addressed an argument that a motion for judgment on the pleadings filed by defendants who had not answered should be denied as premature. *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26, 35 (D.D.C. 2004). While recognizing the temporally limiting language of Rule 12(c), the court concluded that the class's argument must fail because, "if a party files a Rule 12(c) motion before its answer, the Court may treat it as a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.* In reaching this conclusion, the court cited numerous other district courts that had arrived at a similar determination and also explained that "[n]o

prejudice to any party results from treating a Rule 12(c) motion as a Rule 12(b)(6) motion because the standard of review for motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is essentially the same as that for motions to dismiss under Rule 12(b)(6)." *Id*. at 35–36.

## B.   <u>Rule 12(b)(6) Standard of Review</u>

In light of the foregoing authorities, the Generic Defendants' motion for judgment on the pleadings filed pursuant to Rule 12(c) will be construed as a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).  When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). Rule 12(b)(6) review also includes consideration of any exhibits attached to the complaint.  *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

The evaluation of a Rule 12(b)(6) motion is "limited primarily to the face of the complaint and attachments thereto." *Starship Enters. of Atlanta, Inc. v. Coweta Ctny., Ga.*, 708 F.3d 1243, n.13 (11th Cir. 2013).  Accordingly, the court has not considered the exhibits attached to either parties' briefing, and conversion under Federal Rule of Civil Procedure 12(d) is not necessary.  *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1232 (11th Cir. 2010) ("A judge need not convert a motion to dismiss into a motion for summary judgment as long as he or she does not consider matters outside the pleadings.").

## IV.  DISCUSSION

The Generic Defendants' motion to dismiss is grounded singularly upon their assertion that the Weeks's state-law tort claims are preempted by federal law. They specifically contend that the federal-labeling requirements imposed on generic-pharmaceutical manufacturers directly conflict with state-tort liabilities and that these conflicting obligations mandate the dismissal of the Weeks's claims against them on the basis of preemption.  The Generic Defendants assert that two recent Supreme Court cases and a 2013 Eleventh Circuit decision unequivocally establish the aforementioned principles and control the present case.  *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013); *PLIVA, Inc. v. Mensing,* 131 S. Ct. 2567 (2011); *Guarino v. Wyeth, LLC*, 719 F.3d 1245 (11th Cir. 2013).

In response, the Weeks argue that the defense of federal preemption rests upon a determination that federal law and state law are in direct conflict and that it is the burden of the Generic Defendants to show that a conflict sufficient to trigger federal preemption exists.  The Weeks contend that the Generic Defendants have not carried this burden.  The specifically contend that the Generic Defendants have not produced evidence necessary to show that the Generic Defendants could not communicate a warning to Mr. Weeks's prescribing physician under federal law.

## A.   <u>Federal Pharmaceutical Regulations</u>

The labeling of pharmaceuticals is heavily regulated by federal law.  Before a pharmaceutical manufacturer may market any new drug to the public, it must first acquire federal approval.   To acquire federal approval, the 1962 Drug Amendments to the Federal Food, Drug, and Cosmetic Act require that a manufacturer prove that the new drug "is safe and effective and that the proposed label is accurate and adequate."  21 U.S.C. §§ 301 *et seq*.; *Mensing*, 131 S. Ct. at 2574.

For a period of time, all manufacturers had to complete the same approval process, whether the manufacturer was seeking to market an entirely new pharmaceutical or merely a new, generic version of an existing drug.  *Mensing*, 131 S. Ct. at 2574.   Because successfully completing the approval process inherently required "costly and lengthy clinical testing" ill-suited to the

development of a thriving generic-pharmaceutical industry, in 1984 Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Amendments, which drastically altered the approval process for new generic pharmaceuticals.  21 U.S.C. § 355(j); *Mensing*, 131 S. Ct. at 2574.

Pursuant to the Hatch-Waxman Amendments, manufacturers of brand-name drugs and manufacturers of generic drugs face two different sets of obligations when seeking federal approval of new pharmaceuticals.   Brand-name drug manufacturers must prove that the proposed label is "accurate and adequate."  21 U.S.C. §§ 355(b)(1), (d); *Mensing*, 131 S. Ct. at 2574.   The manufacturers of generic drugs, on the other hand, are not independently required to demonstrate the accuracy or adequacy of their labels.   Rather, generic-drug manufacturers are obligated to ensure that their proposed warning label is identical to the label of the corresponding brand-name drug.

## B.   <u>Analysis</u>

A defense of federal preemption is grounded upon the Supremacy Clause of the United States Constitution.  The Supremacy Clause states that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.  This constitutional mandate has been interpreted to require any state

law, including those creating state-tort duties, to give way when it is determined that the law is in direct conflict with a federal law.  *Mensing*, 131 S. Ct. at 2577. ("Where state and federal law 'directly conflict,' state law must give way." (quoting *Wyeth v. Levine*, 555 U.S. 555, 583 (2009))).  The Supreme Court has explained that state and federal law directly conflict for preemption purposes when it is "impossible for a private party to comply with both state and federal requirements."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

To be sure, this is not the first case in which a court has been tasked with determining whether state-tort laws directly conflict with the federal laws regulating pharmaceuticals.  In fact, the Supreme Court addressed a similar preemption defense brought on behalf of the generic manufacturers of MCP in 2011.  In *Mensing*, plaintiffs similarly situated to the Weeks alleged that the long-term use of MCP had caused them to develop TD and that the generic manufacturers of MCP were liable under state-tort laws "for failing to provide adequate warning labels."  131 S. Ct. at 2573.  Specifically, they contended that, "despite mounting evidence that long term [MCP] use carries a risk of [TD] far greater than that indicated on the label, none of the [m]anufacturers had changed their labels to adequately warn of that danger."  *Id.* (internal quotation marks omitted).

The *Mensing* defendants countered the plaintiffs' claims with a theory of federal preemption.   Like the Generic Defendants in the present action, the *Mensing* defendants explained that "federal statutes and FDA regulations required them to use the same safety and efficacy labeling as their brand-name counterparts," and, accordingly, it was impossible for them "to simultaneously comply with both federal law and any state tort-law duty that required them to use a different label."   *Id*.   With these contentions in place, the Supreme Court examined whether the *Mensing* defendants had an avenue by which they could comply with both federal drug regulations and state-tort laws.

Relying heavily on the FDA's interpretations of the federal requirements imposed upon generic pharmaceutical manufacturers, the Supreme Court determined that the *Mensing* defendants were without a viable means of complying with both state and federal law.   Specifically, the Supreme Court determined that federal law prohibited the generic manufacturers from unilaterally changing their labels via the "changes-being effected" process or providing heightened warnings directly to physicians via "Dear Doctor" letters.   *Id*. at 2575.   Accordingly, the Supreme Court concluded that federal law preempted the *Mensing* plaintiffs' failure-to-warn state-tort claims.

Two years later, the Supreme Court extended its holding in *Mensing*, concluding that federal pharmaceutical regulations also preempted state-tort claims

against generic manufacturers based upon design-defect theories.  *See Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).  The Supreme Court rejected the First Circuit's rationale that *Mensing* was distinguishable because the generic manufacturer could have complied with state design-defect laws and federal regulations simultaneously by choosing to not make the drug at all.  It determined that a "stop-selling" rationale was "incompatible with . . . pre-emption jurisprudence."  *Id*. at 2477.  The Court ultimately concluded that state-tort laws that require generic manufacturers to "render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws" and preempted accordingly.  *Id*. at 2479.

Recently, the Eleventh Circuit applied the Supreme Court's holdings in *Mensing* and *Bartlett*.  In *Guarino v. Wyeth, LLC*, 719 F.3d 1245 (11th Cir. 2013), a plaintiff appealed from a district court's dismissal of her claims in favor of a generic manufacturer of MCP.  The district court had explicitly relied upon the Supreme Court's decision in *Mensing*, and on appeal, the plaintiff argued that *Mensing* was distinguishable because her negligence claim was based upon a "failure to communicate" theory.  *Id*. at 1247–48.  Addressing the plaintiff's artful attempt to overcome federal preemption, the Eleventh Circuit spoke to the scope of *Mensing*, explaining that any state law cause of action grounded upon a generic manufacturer's taking unilateral action is preempted because the federal law "duty

17

of sameness" makes generic manufacturers dependent upon brand-name manufacturers. *Id*. at 1249.

The Generic Defendants argue that *Mensing*, *Bartlett*, and *Guarino* control the entirety of the Weeks's action against them. The Weeks do not contest the federal preemption principles asserted by the Generic Defendants. Rather, they argue that the Generic Defendants' motion to dismiss should be denied because the Generic Defendants have yet to "adduce[ ] evidence necessary to warrant" dismissal under *Guarino* or the other applicable cases.

Relying on *Guarino* and *Morris v. PLIVA, Inc.*, 713 F.3d 774 (5th Cir. 2013) – a Fifth Circuit decision favorably cited in *Guarino* – the Weeks contend that for the Generic Defendants to prove federal preemption, they have to produce evidence establishing that the Brand Name Defendants did not communicate the approved warning to Mr. Weeks's prescribing physician. If the Brand-Name Defendants communicated an updated warning, then the Generic Defendants also would have been free to communicate such a warning under the applicable federal regulations, thereby avoiding any preemption issues.

To be clear, the Weeks are not arguing that the Brand-Name Defendants did communicate an updated warning. In fact, they confirm that their Amended Complaint includes an allegation that not one Defendant, whether Brand Name or Generic, "communicated information of any kind about the drug to Mr. Weeks'[s]

18

prescriber after 2002." (Doc. # 194, at 7.) The Weeks merely argue that the Generic Defendants are the party attempting to rely upon federal preemption, and, accordingly, they are the party that is required to demonstrate the existence of a conflict.

When considering the legal standard for evaluating a motion to dismiss, it is clear that the Weeks's argument is without merit. Addressing a Rule 12(b)(6) motion, a court is required to accept all factual allegations of the complaint as true and then determine whether the plaintiff has stated a plausible claim upon which relief can be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."). Accordingly, because the Weeks expressly allege in their Amended Complaint that the Brand-Name Defendants failed to communicate any updated information to Mr. Weeks's prescribing physician, this court joins the several other district courts that have determined a consumer's state-law tort claims to be preempted by federal law in accordance with Supreme Court and circuit precedent. *Cooper v. Wyeth, Inc.*, No. 09-929-SDD-SCR, 2013 WL 6502554, at *4 (M.D. La. Dec. 11, 2013); *Del Valle v. Qualitest Pharm. Inc.*, No. B-11-113, 2012 WL 2899406, at *3 (S.D. Tex. June 22, 2012); *Fullington v. PLIVA, Inc.*, No. 4:10CV00236, 2011 WL 6153608, at *6 (E.D. Ark. Dec. 12, 2011); *Metz v. Wyeth, LLC*, No. 8:10-CV-2658-T-27AEP,

2011 WL 5024448, at *3 (M.D. Fla. Oct. 20, 2011); *Demahy v. Wyeth, Inc.*, No. 08-3616, 2011 WL 5505399, at *1 (E.D. La. Aug. 30, 2011).

## V.  CONCLUSION

Based on the foregoing analysis, it is ORDERED that Defendants Teva and Actavis's Motion to Dismiss (Doc. # 191) is GRANTED.

DONE this 3rd day of August, 2015.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE